Good morning, Your Honors, and may it please the Court. This is a case where the immigration judge made a credibility determination that was completely subjective. She used her own ideas of how she thought things should work and applied them to instances in this case as they happened in Uzbekistan, 10,000 miles away. So much so that even in its decision sustaining the immigration judge's credibility determination, the Board of Immigration Appeals even conceded the point that pursuant to the laws of the Ninth Circuit Court of Appeals, the adverse credibility determination by the immigration judge does not follow the law of this circuit. Yet despite that, they sustained the appeal, or dismissed the appeal I should say, and sustained the judge's decision. Now the judge used certain instances of the case to make that determination where she had no right to do so. She used matters such as how many members of the church that petitioner attended there were and quizzed the petitioner on exactly how many members there were. Now anybody who goes to church understands that a church has an open door policy. There could be 1,000 members, there could be 500 members. You can't expect a member of the church to know exactly that information. She used information she found on the registration cards that were submitted by the petitioners, both husband and wife, and decided that based on the number that she found in the card that there could be no way that this card was legitimate. Without knowing anything about how these cards are issued, how the serial numbers on the cards are issued, she just decided that this can't be a valid card based on that. Furthermore, she claimed that the petitioner, female petitioner, was vague as to the aspect of the church and what it stood for. Even though, if you look in the record, the petitioner did give a thorough description of exactly the principles of the church and what it stood for. To the judge, that wasn't enough. Even if the petitioner was or had a basic knowledge of the church, she is a church attendee. She's not a pastor. That brings up something. All of that assumed to be accurate. But there were discrepancies or implausibilities lurking in the difference between how she and her husband characterized the nature of his February 2002 injuries, differences in how you could, he said his parents could continue going to the Grace Church without difficulty. Her parents, she said her parents couldn't. And there's a difference between what she said about why she was afraid to return, on the one hand, because of possible persecution as either a Russian or a religious person. Or Korean. And the fact that they were after her for having failed to make a payment that she owed to someone. So those are fairly serious inconsistencies. Why, in light of those inconsistencies, was it inappropriate for the BIA to say, look, you had plenty of opportunity to get corroborated with the church. Because you came to this country. You talked to a lawyer. The lawyer told you, you're going to need documents. You went home. Several of these incidents occurred after she went home, knowing that she wanted to seek asylum. So she gets no corroborating information from her folks, from her brother about the incident, from the church, showing her membership, showing the church is or is not registered, showing the extent of injuries, if any. There's all sorts of stuff that was available to her, none of which she produced. So what's wrong with that? Well, she felt she produced the evidence that was available to her. She produced testimony of ‑‑ Well, you know that something from her parents saying they had problems going to church was easily obtainable. She was back in the country for eight or nine months. Well, in ‑‑ if a document like that was submitted, it would be over the objection of opposing counsel, of government counsel, because the parents were not available to testify to that declaration. Those items are ‑‑ Well, declarations are submitted in INS cases all the time. Well, I've seen them where the judge ‑‑ this particular judge probably would not have admitted it. She didn't have that corroborating evidence. And we could see that point. But she did have evidence to show that they were, in fact, persecuted. What she had was what? Help me out. What she had was her testimony? Well, she had her ‑‑ She had her husband's testimony? That's correct, Your Honor. In addition, she had testimony from a pastor of the church that's located here in Los Angeles. Okay. And she also had a licensed psychologist that testified that she interviewed the respondent, the female respondent, and that her story is ‑‑ or her symptoms are consistent with somebody who's been subjected to persecution, abuse, and torture. So that's what she did have. Now, and I understand your point, Your Honor. I do want to state for the record this is a pre‑Real ID Act case. I was just going to ask that. Which standard are we applying here? We're applying a pre‑Real ID Act standard where ‑‑ Corroboration of otherwise credible testimony is not required. That's correct, Your Honor. Just the testimony of the respondent alone, if credible, can be sufficient to prove well‑founded fear of persecution. And we do ‑‑ we do state that there was cooperation. Now, could she have gotten a letter from her parents? Sure, but how valid is that testimony? You can ask your parents or your family members to write just about anything. That doesn't make it that much stronger. In a pragmatic sense, I don't think I would even submit a letter from somebody's mother that says that, yeah, my son or my daughter was persecuted. I.J. makes a point, well, why didn't they submit anything from their church in Uzbekistan? I think I tend to agree that the notion that they should have submitted church bulletins is a little bit bizarre, because that's speculating on the basis of American churches, established churches that actually have publications and print bulletins, and some of that's throughout this decision. But couldn't they have produced something that documented their participation? I mean, what's the reason for that? I realize that I.J. didn't ask that question and didn't give him a chance to explain that, but what could they have produced from the church that they didn't produce? When you answer the question, could you keep your voice up, please? Oh, thank you. I can't hear. You can't hear me? Oh. Oh, sorry. Talk louder. Yeah, I'm pretty loud. Your Honor, they did submit registration cards from the church. Now, where are those? The Chinese church. Without, and I apologize, I don't have the exhibit number right in front of me. This is the translation of the card? That's correct, Your Honor. It's in English? It is in English, yes. If it pleases the Court, I'd like to save the remainder of my time for purposes of rebuttal. Okay. Thank you. I'm sorry about that. I couldn't hear you. May it please the Court, Jennifer Corey for the United States, Attorney General Holder. The issue on review here is whether the record compels the conclusion that contrary to the agency's determination, the petitioner was telling the truth. Substantial evidence supports agency's finding that she was not. IJ's adverse credibility determination was not only based on ambiguities and inconsistencies in the testimony, but it was also based on petitioner's failure to provide easily available, unduplicative, and material corroborative evidence for her claim in question. Wait a second. What are we reviewing, the BIA decision or the IJ decision? The BIA decision. Okay. So the BIA, with respect to the adverse credibility findings, said that, made an alternative. It said, even if the reasons provided by the immigration judge for finding the respondent's testimony incredible or insufficient to sustain an adverse credibility finding under the applicable law of the Ninth Circuit, which they're pretty weak, okay, but they make an alternative finding. They say, we find that the weaknesses in the record noted by the immigration judge provided the immigration judge with legitimate reason to consider whether the respondents provided reasonably available corroboration. Now, I'm not sure what that means. First of all, what weaknesses in the record required corroborating evidence under Ninth Circuit law at the time? All right. Ninth Circuit law pre-Real ID Act, in a case called Siddu, clearly stated that where an applicant hasn't established credible testimony and then fails to provide what would be easily available expected material evidence, then that is enough for an adverse credibility determination. Right. But what I'm saying is the BIA decision that we're reviewing says, okay, even if the adverse credibility isn't supported by substantial evidence, there's other weaknesses in the record that support, okay? So I'm saying let's assume, let's take the evidence as credible. What are the weaknesses in the record that otherwise support the IJ's opinion? The BIA, let me see if I understand your question. The BIA, it actually wasn't an alternate finding. Well, it is kind of. That's what the BIA does when they're worried that on appeal, that we might find that the adverse credibility determination isn't supported by substantial evidence. They slip in an alternative finding. And so I'm probing the alternative finding because I'm finding a lot of problems with the adverse credibility finding. Right. If I could just explain to you the basis for the alternative finding. Okay. Just first I want to say that the way it is worded is a little bit, it misrepresents what the IJ did find. Sorry. The BIA is misrepresenting? No, no, no, no. It's not a misrepresentation. Sorry. It looks like an alternate finding, but it's in fact just affirming what the IJ did find, which is an adverse credibility determination based upon inconsistencies and then based upon glaring omissions of corroborative evidence. The IJ's adverse determination. Okay. So I think your strongest argument on that is the point that Judge Reimer made, which was that she was here, met with a lawyer, told she needed some more documents, went back, didn't get the more documents, and then came back. So I think that's your strongest point. So what items could she have brought back? It's kind of endless. Sorry. That's where I was getting to next. She had eight months, and she was put on notice that she needed documents to support her asylum claim. Yet she didn't bring back ñ I mean, I agree with you about maybe the church bulletin, but she could have taken pictures of the church. She could have gotten an affidavit from her pastor or from other church members, from her family members. She could have ñ apparently she got a notice to appear regarding her alleged arrest before she left. She could have brought that back with her. She could have ñ there's so much stuff, I believe. How do you know all of this would be available to her? Well, at least she failed to bring back medical documents that she said that she just didn't bring back. Did anybody ever ask her? I haven't read the entire record. Did anybody ever ask her why she didn't have any corroboration or documentation? Had she gone back in order to get it? No, there was no ñ except for the medical documents. They asked her why she didn't bring back medical documents, and she said that she just didn't think it was necessary, which is not consistent with the fact that she was put on notice. Was she asked about why the membership in the church was in English and not in Uzbek or Russian or whatever the language would be? The ñ that problem was pointed out, and there was no explanation given. Right, they didn't provide the original document for that. So what the IJ found was an adverse credibility determination, not only based on inconsistencies, but then subsequently based on the fact that in spite of her knowledge of the asylum process, Petitioner didn't bring back evidence that logically would be expected if she were telling the truth. So ñ and then the evidence that she did bring back was ñ or not bring back, she submitted at some point was ñ is pretty shoddy. Like you said, there's no original provided for her church registration. The marriage certificate had the date crossed out on it and corrected just in pen. And additionally, she could have ñ she could have had ñ the only witnesses that she brought, which was really her only corroboration, were witnesses whose testimony was based on what they heard from Petitioner, her psychologist, her pastor. Their testimony was based only on what Petitioner told her. Do we know what the attorney told her that would be necessary for corroboration?  I mean, we ñ it is a strong argument that she met with an attorney and then she went back. Do we have any idea of what he told her would be sufficient? Because she did have birth certificates, marriage certificates. She had ñ you know, she had the translation of the document, which ñ I mean, I don't see that as being so fatal because you would think you were in an American court, you would bring in a translation. So, I mean, do we know what, you know, what were the ñ did anyone ask her what were the parameters of things that she should have been looking for and why she didn't look for them? There was no specific evidence about what the attorney exactly told her to bring. But she did say that she ñ whatever it is he told her she needed, that she didn't have them at the time and that she only had her passport at the time. At the time she met with the attorney, she also wasn't married. So what I can conclude from that is the attorney ñ basically the only things that she really provided from Uzbekistan was a marriage certificate and then the passport that she already had. So those are clearly ñ that wasn't above and beyond what ñ she had those documents basically at the time and then didn't provide anything above and beyond that. So clearly she didn't ñ she didn't bring back whatever the attorney asked. The record is what it is. Right. Anyway, I see that my time is running down. I just wanted to say also that she didn't bring the ñ it seems logical and reasonable that she could have had the attorney sign an affidavit saying that she came here to apply for asylum. She had a friend at the time who lived here that she said also still lived in L.A. and actually lived with them that could have also testified on her behalf that she came here on her first trip to apply for asylum. But she did neither of those things. So based upon all those ñ all those inconsistencies and omissions of reasonably expected corroboration, substantial evidence supports the agency's decision and the Court's denied position for review. Thank you. You cannot base a credibility determination based on speculation and conjecture. And I think that requesting corroborative evidence and the judge asking for evidence that she thinks would have been available  is doing just that. Counsel, that may be true as far as it goes. But the problem here, and I've never seen this in an immigration case, where the petitioner actually returns to her home country in order to get corroboration because she knows that her claim is insufficient. She's been told that on her ñ she's been told she needs corroboration. She goes back to get it and then doesn't really have much. And that seems to me quite unusual. Well, Your Honor, according to her testimony, she returned because her husband was arrested. Now, she did meet with an attorney while she was here in the United States, but there was no evidence as to what that attorney advised her. This is ñ again, we're using conjecture and speculation that the attorney advised her, that the attorney was an expert in immigration law and he advised her as an expert attorney would to bring back these documents. She brought back more documents. She brought back proof that she was married. But we cannot guess as to what kind of documents were available. I'd like to thank the Court for their time. Thank you. The case just argued is submitted.
judges: Schroeder, Rymer, Wardlaw